*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MEYERS/WITHERS/MCCLELLAND, Minors.

UNPUBLISHED
December 19, 2024
9:43 AM

No. 369319
Macomb Circuit Court
Family Division
LC No. 2023-000131-NA
2023-000132-NA
2023-000133-NA

Before: O'BRIEN, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating her parental rights to NM, LW, and LM (collectively, "the children"), pursuant to MCL 712A.19b(3)(b)(*ii*) (parent failed to protect the child or sibling from sexual abuse and there is a reasonable likelihood of future abuse), (b)(*iii*) (nonparent caused sexual abuse of the child or sibling and the child will likely suffer injury or abuse if returned to the parent), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm). We affirm.

## I. BACKGROUND

The trial court entered an ex parte order taking the children into protective custody after Children's Protective Services (CPS) received a complaint containing allegations of domestic violence and sexual abuse. The Department of Health and Human Services (DHHS) filed a permanent custody petition seeking termination of respondent's parental rights to the children. The petition alleged that Brandon Pfeil, respondent's husband, molested LW and frequently engaged in domestic violence with respondent. The petition also alleged that respondent failed to protect the children from Pfeil despite knowing that he was a sex offender. At the preliminary hearing, Charisma Puryear, a CPS caseworker, testified that the allegations in the petition were true and that nothing short of removal would guarantee the children's safety. Respondent waived the probable-cause finding and the trial court authorized the petition.

Subsequently, the lawyer guardian ad litem (LGAL) filed a permanent custody petition raising the same allegations contained in the DHHS petition. In addition, the LGAL's petition alleged that respondent and Pfeil engaged in a physical fight while the family was on vacation together, and that respondent asked LW to record the fight, which she did. During the fight, Pfeil attempted to get NM to hit respondent, and respondent told NM that it was okay if he hit her. NM cried during the incident and said that he did not want to hit respondent. The petition also alleged that respondent allowed Pfeil to spank LW, respondent often locked NM in his bedroom for multiple days and gave him a bucket to use as a toilet, Pfeil physically abused NM, respondent and Pfeil told the children to lie to CPS about the physical abuse, and respondent frequently brought new men around the children. The petition also stated that NM reported that respondent sold his prescription medication, stole the $3,000 he earned from working at McDonald's and spent it at a dispensary, and Pfeil threatened NM to lie to CPS or Pfeil would kill him. The trial court ruled that a preliminary hearing for the LGAL's petition was not necessary because it held a preliminary hearing for the DHHS's petition. The trial court authorized the LGAL's petition.

At trial, the parties stipulated that Pfeil touched LW's vagina for sexual gratification. LW testified that Pfeil lived with respondent and the children while he was on parole for having sex with a 14-year-old girl and that he was not allowed to be around children. LW stated that Pfeil often massaged her legs and touched her vagina on two occasions, once through her underwear and once directly on her skin.

LW also testified regarding the domestic violence incident that occurred while the family was on vacation in June 2023. She stated that respondent told her to record the fight and that while she was recording, Pfeil hit LW twice. LW further testified that during the fight, respondent told NM to hit her because Pfeil wanted respondent to go home with bruises and scratches like he had. LW stated that NM sobbed and said he did not want to hit respondent. Therefore, respondent told LW to hit her and LW complied. LW testified that respondent left Pfeil at the vacation home and drove away with the children. However, LW stated that respondent returned to the vacation home after Pfeil texted her and told her that leaving him would set a bad example for the children. On the same day as this fight, LW testified that she told respondent about Pfeil sexual abusing her and respondent did not believe LW and told LW that respondent was going to administer a lie-detector test to LW. The trial court admitted the videos that LW recorded of the fight.

LW also testified that she witnessed Pfeil hit respondent on multiple other occasions and that watching Pfeil and respondent engage in domestic violence scared her. LW testified that Pfeil spanked LW and physically abused NM while respondent was present. LW testified regarding one occasion when Pfeil held NM by his neck against the bed and left marks on his neck. LW could not recall if respondent did anything other than watch, while LW was crying and telling Pfeil to stop. LW stated that Pfeil and respondent told the children to lie about the choking if CPS workers talked to them.

LW also testified that respondent often punished NM by locking him in his room for up to two days and denying him bathroom privileges. When respondent did not provide a bucket for NM to use as a toilet, NM would urinate in the vent in his bedroom.

Finally, LW testified that respondent began dating a new man in July 2023, and LW did not want to live with respondent again, even if she got help, because LW did not feel safe with

respondent and was concerned that respondent might resume her relationship with Pfeil. However, LW also conceded that joint therapy with respondent and herself could be helpful. LW also testified that respondent told her that LW's father was dead and that when LW discovered that respondent lied, she was happy that her father was alive but upset that respondent lied to her.

NM testified that respondent sold NM's prescription Adderall on 27 different occasions while NM was with her. NM also stated that he wanted respondent's parental rights terminated and that he did not feel that therapy would work.

Respondent testified that she knew Pfeil was a sex offender when he moved in with her and that he was on parole when they got married, but she thought that his sex-offender conviction was for urinating in public and did not verify the truthfulness of Pfeil's statement regarding what he was convicted for. Respondent denied most of the allegations in LW and NM's testimony, and accused LW and NM of lying.

The trial court ultimately found statutory grounds to assume jurisdiction under MCL 712A.2(b)(1) and (2). The trial court stated that it did not find respondent's testimony credible, especially since respondent testified that "everyone has lied but her." The trial court found that even if respondent did not know why Pfeil was on the sex-offender list, her neglect in finding out why he was on the list resulted in harm to LW. The trial court opined that the testimony painted respondent's home as an environment of "pure chaos, abuse, and neglect." The trial court also noted that the videos of the fight while on vacation were "deeply disturbing" and found that respondent escalated the fighting.

The trial court also found that there were statutory grounds for termination under MCL 712A.19b(3)(b)(*ii*), (b)(*iii*), (g), and (j) after finding that respondent failed to protect the children from Pfeil, encouraged two of them to physically assault her, intentionally put the children in position to witness domestic violence and be victims of domestic violence, and exposed them to drug deals, physical abuse, sexual abuse, emotional abuse, and verbal abuse. Finally, the trial court determined that it was in the children's best interests that respondent's parental rights be terminated despite the children's placements with relatives due to the risk of harm presented to the children while in the care of respondent.

This appeal followed.

## II. JURISDICTION

On appeal, respondent argues that the trial court clearly erred when it found statutory grounds existed to take jurisdiction of the children, in part because the trial court failed to hold a preliminary hearing on the petition filed by the LGAL. We disagree.

We review a trial court's decision to exercise jurisdiction for clear error, in light of the trial court's factual findings. *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. (quotation marks and citation omitted). "To acquire jurisdiction, the factfinder must determine by a preponderance of the evidence that the child comes within the statutory requirements of MCL 712A.2." *Id*. (quotation marks and citation omitted).

Generally, when a petition is filed in a child-protective proceeding, the trial court must hold a preliminary hearing to determine whether it should authorize the petition. *In re Ferranti*, 504 Mich 1, 15 & n 6; 934 NW2d 610 (2019). However, when the children subject to the petition are not in temporary custody and the petition is not accompanied by a request for placement of the children, a trial court may conduct a preliminary inquiry instead of a preliminary hearing. MCR 3.962. Here, the children were placed in temporary custody with the DHHS when the LGAL filed her petition. Therefore, the trial court was required to conduct a preliminary hearing on the LGAL's petition. The trial court erred when it failed to do so.

The trial court's error is subject to the harmless-error rule. See *In re Miller*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 364195); slip op at 5 (explaining that the harmless-error rule applies to child-protective proceedings); see also MCR 2.613(A) (explaining that the harmless-error rule applies to a trial court's error in a ruling). MCR 2.613(A) provides:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.

"To overcome this rule, a party must show that an error was prejudicial such that a failure to grant relief would be inconsistent with substantial justice, i.e., that it is more likely than not the error affected the case's outcome." *In re Miller*, ___ Mich App at ___; slip op at 5.

The trial court's error did not affect the outcome of the case. Had the trial court conducted the preliminary hearing, it would likely have found probable cause that one or more of the allegations in the petition were true because it held a preliminary hearing on the DHHS's petition, which was identical to the LGAL's petition absent the additional facts included in the LGAL's petition, and the trial court found probable cause that one or more of the allegations in the DHHS's petition were true. Indeed, the trial court specifically ruled that a preliminary hearing for the LGAL's petition was not necessary because it held a preliminary hearing for the DHHS's petition. Moreover, the trial court ultimately found clear and convincing evidence existed to terminate respondent's parental rights based primarily on testimony relating to the facts alleged in the petition. See MCR 3.965(B)(12) ("The court may authorize the filing of the petition upon a showing of probable cause, unless waived, that one or more of the allegations in the petition are true and fall within MCL 712A.2(b)."). Therefore, had the trial court held the preliminary hearing on the LGAL's petition, it likely would have still authorized the LGAL's petition and proceeded to trial thereon.

However, even if the trial court would not have authorized the LGAL's petition after holding a preliminary hearing, the outcome of the proceedings would have been the same because the parties would still have gone to trial on the nearly identical petition filed by the DHHS. The DHHS's petition contained many of the same factual allegations and requested termination of respondent's parental rights under the same statutory grounds listed in the LGAL's petition. While the LGAL's petition provided more factual allegations than the DHHS's petition, the DHHS's petition referenced the same types of behavior and concerns described in the LGAL's petition. Since the two petitions were effectively identical, it is unlikely that the outcome of the trial court's

-4-

proceedings would have been different had it held a preliminary hearing on the LGAL's petition and decided not to authorize it. Therefore, the trial court's error of failing to hold a preliminary hearing on the LGAL's petition was harmless.

Respondent provides no legal support for her assertion that the parties could only rely on testimony that their attorneys elicited to establish factual support for their respective petitions. Therefore, this argument is abandoned. See *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 695; 880 NW2d 269 (2015) (explaining that a party's failure to cite legal authority in support of its position renders the issue abandoned).

Moreover, respondent's assertion is inconsistent with binding legal authority. A petitioner bears the burden of proving by a preponderance of the evidence that one or more statutory ground for exercising jurisdiction exists. *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014). Here, both the DHHS and the LGAL had this burden with respect to their petitions. Respondent argues that both the DHHS and the LGAL had to present evidence by themselves that satisfied their burden of proof. However, the burden of proof does not require that each petitioner *present* evidence sufficient to meet their burden of proof. Rather, it only states that the petitioner must demonstrate that "the evidence" presented amounts to a preponderance of evidence suggesting one or more statutory ground for jurisdiction exists. *Id.* To adopt respondent's reasoning would mean that a party could never use testimony elicited from an opposing party or the trial court's own questioning. That notion goes against decades of established legal procedure. The petitioners were not limited to the evidence they presented to meet this burden; rather, they were free to wield the totality of the evidence presented at trial in support of their positions. *Id.*

Respondent also argues that the trial court's failure to hold a preliminary hearing on the LGAL's petition rendered all of the evidence elicited by the LGAL fruit of the poisonous tree. This argument is also abandoned because respondent cited no legal authority in support thereof. See *Bill & Dena Brown Trust*, 312 Mich App at 695. Moreover, children have a right to counsel in protective proceedings, and their attorney is required to be present at every hearing. MCL 712A.17d(1)(h); *In re AMB*, 248 Mich App 144, 222; 640 NW2d 262 (2001). LGALs appointed in protective cases are entitled to "fully and actively participate in all aspects of the litigation." MCL 712A.17d(1)(b). Therefore, the LGAL in this case was entitled to question witnesses regardless of whether she was doing so in an effort to prove the contents of her own petition. Even if the trial court would not have authorized the LGAL's petition, it was proper for the trial court to consider the testimony elicited by the LGAL because LGALs are allowed to question witnesses when they have not filed independent petitions, and respondent failed to present any legal authority suggesting that the testimony the LGAL elicited was inadmissible.

Finally, there was sufficient evidence for the trial court to assume jurisdiction over the children. After a petition is authorized, the trial court must hold an adjudicative hearing to determine "whether the trial court can exercise jurisdiction over the child (and the respondents-parents) under MCL 712A.2(b) so that it can enter dispositional orders, including an order terminating parental rights." *In re Ferranti*, 504 Mich at 15. At trial, "the petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *Id.*

In this case, the trial court assumed jurisdiction over the children under MCL 712A.2(b)(1) and (2), which provide, in relevant part, that the court has jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being . . . .

> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

The trial court found that the testimony of NM and LW was credible. We must ordinarily defer to that finding. *In re Casto*, 344 Mich App 590, 614; 2 NW3d 102 (2022). With respect to MCL 712A.2(b)(1), the evidence established that respondent neglected NM's medical needs when she sold his medication, and neglected his physical needs when she locked NM in his room for multiple days at a time and denied him access to a bathroom. Respondent neglected LW's safety needs when she told LW to record the fight between herself and Pfeil, which resulted in Pfeil hitting LW twice. Respondent neglected all of the children's safety needs by allowing a known sex offender to live with her and have unsupervised access to the children, which gave Pfeil the opportunity to sexually assault LW on multiple occasions. Respondent neglected LW's and NM's emotional needs by lying to LW about her father being dead and telling NM to hit respondent during the fight on vacation while he was sobbing and saying he did not want to. Respondent neglected all of the children's safety and emotional needs by regularly engaging in domestic violence in their presence. With respect to MCL 712A.2(b)(2), respondent's home was unfit for the children to live in because Pfeil sexually abused LW, physically abused NM and LW, and frequently engaged in domestic violence with respondent. Additionally, the videos of the vacation fight demonstrated that respondent provoked Pfeil during the fight instead of trying to deescalate the situation, indicating that respondent's behavior contributed to the duration and intensity of the fights between herself and Pfeil. The foregoing demonstrates that the trial court did not clearly err by finding there was a preponderance of evidence to take jurisdiction over the children under MCL 712A.2(b)(1) and (2).

## III. STATUTORY GROUNDS

Respondent also argues that the trial court clearly erred when it found that statutory grounds existed to terminate respondent's parental rights. We disagree.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 333; 985 NW2d 912 (2022) (quotation marks and citation omitted). This Court reviews for clear error a trial court's finding that statutory grounds exist for termination. *In re Atchley*, 341 Mich App 332, 343; 990 NW2d 685 (2022). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe

the witnesses." *In re Sanborn*, 337 Mich App 252, 272-273; 976 NW2d 44 (2021) (quotation marks and citation omitted). This Court need not consider additional grounds for the trial court's decision if termination was supported by at least one statutory ground. *In re Jackisch/Stamm-Jackisch*, 340 Mich App at 333-334.

On December 20, 2023, the trial court issued its oral opinion from the bench and found statutory grounds to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(b)(*ii*), (b)(*iii*), (g), and (j).

MCL 712A.19b(3) provides:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> * * *
>
> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

The harm contemplated by MCL 712A.19b(3)(b)(*ii*) "must be caused by a parent's act or a nonparent adult's act" rather than "an unintentional omission." *In re LaFrance*, 306 Mich App 713, 725; 858 NW2d 143 (2014) (quotation marks omitted). "MCL 712A.19b(3)(b)(*ii*) addresses the harm occasioned by a parent who is unwilling or unable to protect his or her children from abuse." *In re Gonzales/Martinez*, 310 Mich App 426, 432; 871 NW2d 868 (2015). Evidence that a respondent puts their own desires above the needs of their children supports terminating the respondent's parental rights under MCL 712A.19b(3)(b)(*ii*). *Id.*

The parties stipulated that Pfeil sexually assaulted LW by touching her vagina for the purpose of sexual gratification. Consequently, LW suffered sexual abuse, and NM and LM had a sibling who suffered sexual abuse, thus satisfying the first requirement under MCL 712A.19b(3)(b)(*ii*). The fact that Pfeil often slapped NM on the face and choked NM is also sufficient to satisfy the first requirement under MCL 712A.19b(3)(b)(*ii*).

Respondent had the opportunity to prevent the sexual abuse because Pfeil told respondent he was a sex offender before they got married. Though there was conflicting testimony about exactly when respondent discovered that Pfeil molested a 14-year-old, respondent knew that Pfeil had sexually abused a 14-year-old by October 2021, 20 months before Pfeil molested LW by touching her vagina for sexual gratification. This clearly demonstrates that respondent had an opportunity to prevent the sexual abuse and failed to do so. Respondent also had the opportunity to prevent Pfeil from physically abusing NM because she witnessed Pfeil's physical abuse of NM. Instead of attempting to protect her children from Pfeil's violent tendencies, however, respondent

-7-

told them to lie if CPS ever asked about Pfeil's violence. Respondent intentionally put the children in positions to witness domestic violence, to be victims of domestic violence, and to be unwilling perpetrators of domestic violence by encouraging NM and LW to hit her. Respondent also made LW film a fight between herself and Pfeil, resulting in Pfeil hitting LW multiple times. Respondent could have attempted to protect her children by having them wait in the car while she packed or by leaving the items behind to get her children to safety. Respondent did neither, which demonstrated that she lacked insight as to how to protect her children.

Instead of ending her relationship with Pfeil after discovering that he presented a serious risk of harm to her children, respondent continued her relationship with Pfeil and allowed him to have unsupervised access to her children. In so doing, respondent put her desires above the needs of her children. See *In re Gonzales*, 310 Mich App at 432 (holding that termination was appropriate under MCL 712A.19b(3)(b)(*ii*) because the respondent placed her desire to be with her abusive boyfriend over the needs of her children). The trial court found that respondent was living with another man at the time of trial, even though she was not yet divorced from Pfeil, and that she had a history of living with different men. Respondent's extremely neglectful behavior and pattern of putting her desires above the needs of her children supported the trial court's finding that there was a reasonable likelihood abuse would occur again in the future if the children were returned to her care. Therefore, the trial court did not clearly err by finding a statutory ground to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*ii*).[1]

## IV. BEST INTERESTS

Finally, respondent argues that the trial court clearly erred when it found that termination was in the children's best interests. We disagree.

We review a "trial court's determination regarding the children's best interests" for clear error. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Jackisch/Stamm-Jackisch*, 340 Mich App at 333.

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App at 732-733, citing MCL 712A.19b(5). Whether termination is in the child's best interest must be established by a preponderance of the evidence. *Id.* at 733. "The focus at the best-interest stage has always been on the child, not the parent." *In re Atchley*, 341 Mich App at 346 (quotation marks and citation omitted). When determining best interests,

> the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home.

---

[1] Only one statutory ground is required to terminate a respondent's parental rights; therefore, we need not address respondent's remaining statutory-grounds arguments. *In re Jackisch/Stamm-Jackisch*, 340 Mich App at 333-334.

The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citation omitted).]

Additionally, the fact that a child is in the care of a relative at the time of the termination hearing is "an explicit factor to consider in determining whether termination was in [a child's] best interests." *In re Olive/Metts Minors*, 297 Mich App 35, 43; 823 NW2d 144 (2012) (quotation marks and citation omitted). "Placement with a relative weighs against termination, but that fact is not dispositive given that a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests[.]" *In re Atchley*, 341 Mich App at 347 (quotation marks and citation omitted).

We conclude that the trial court did not clearly err when it found by a preponderance of the evidence that termination of respondent's parental rights was in the best interests of the children. Preliminarily, the trial court expressly considered the children's placement with relatives before finding that it was in their best interests to terminate respondent's parental rights. The trial court concluded that each of the children's placements with relatives did not outweigh their needs to safety, permanency, and finality. NM and LW did not have a bond with respondent and both children expressed their desire for termination of respondent's parental rights. NM felt safe and comfortable in his placement and wanted to stay there. LW liked her placement and was bonded with her caregiver. LM was the only child who still wanted to live with respondent, evidencing that she still felt a bond with respondent; however, LM also liked her placement. The trial court noted that LM was eight years old at the time of trial and still "very much in need of parental direction." The trial court stated that it was typical for a child that age to want to be with her parent, even though that parent does not keep her safe or meet her needs. The children's placements were able to provide the children with permanency, stability, finality, and safety that the children needed.

Respondent's poor parenting skills supported the trial court's best-interests finding. Respondent demonstrated poor parenting skills when she allowed Pfeil to have unsupervised access to her children despite knowing that he was a child molester and physically abusive. Respondent also demonstrated her poor parenting skills when she escalated the recorded fight on vacation at multiple points by calling Pfeil names, asking him to hit her, and taunting him. Further, respondent did nothing to shield the children from the fight; instead, she asked them to film the fight and hit her. Respondent also exhibited poor parenting skills when she told LW that her father had died and regularly sold NM's prescribed medication.

Respondent's history of domestic violence with Pfeil also weighed in support of the trial court's best-interests finding. All of the children were in therapy and suffering from post-traumatic stress as a result of being in respondent's care. Further, LW was diagnosed with posttraumatic stress disorder (PTSD), anxiety, and depression, and both NM and LW suffered from nightmares and flashbacks. NM was diagnosed with attention deficit hyperactivity disorder, oppositional defiant disorder, obsessive-compulsive disorder, and Asperger's syndrome. Further, Pfeil molested LW and physically abused LW and NM while they were in respondent's care, evidencing that respondent did not protect the wellbeing of her children while they were in her care.

Additionally, LW expressed that she did not feel safe with respondent, that she was scared when she saw respondent engage in domestic violence, and that she was worried that respondent would resume her relationship with Pfeil. In light of this evidence, we conclude that the trial court did not clearly err by finding that it was in the children's best interests to terminate respondent's parental rights.

Affirmed.


/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Sima G. Patel